**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| MURRAY WALTER PISONY, | Case No.: 6:17-cv-00055 RP-JCM |
| *Plaintiff/Counterclaim Defendant,* | |
| v. | JURY DEMAND |
| COMMANDO CONSTRUCTION, INC. and JAMES MCLEOD HOLDINGS, INC., | |
| *Defendants/Counterclaim Plaintiffs.* | |

**DEFENDANTS/COUNTERCLAIM PLAINTIFFS'
OPENING CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

Page

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................... 2

    A.   Scope and Content of Prior Art.................................................................. 2

    B.   The Asserted '629 Patent .......................................................................... 4

    C.   The Accused Machines .............................................................................. 7

    D.   Procedural Background............................................................................... 8

III. ARGUMENT AND AUTHORITIES ................................................................... 9

    A.   Legal Principles of Claim Construction..................................................... 9

    B.   Level of Ordinary Skill in the Art ........................................................... 10

    C.   Disputed Claim Terms ............................................................................ 11

        1.   "an extendible mast".................................................................... 11

        2.   "the conveyor assembly includes … a pivotal connection for the frame to permit angular adjustment of the frame relative to the chassis".......... 16

        3.   "the mast includes a hydraulic cylinder drivable to telescope to various lengths" ..................................................................................... 17

IV.  CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
    616 F.3d 1249 (Fed. Cir. 2010) ................................................................. 17, 20

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) ................................................................. 17

*Every Penny Counts, Inc. v. Am. Express Co.*,
    563 F.3d 1378 (Fed. Cir. 2009) ................................................................. 7

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ................................................................. 9

*Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc.*,
    639 F.3d 1303 (Fed. Cir. 2011) ................................................................. 9, 13

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ................................................................. 9, 10

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ................................................................. 14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ................................................................. 11, 20

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................. 9, 10, 14

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) ................................................................. 10

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................. 9, 10

**Statutory Authorities**

35 U.S.C. § 102 ................................................................................................. 6

35 U.S.C. § 103 ................................................................................................. 7, 15

35 U.S.C. § 112 ................................................................................................. 9, 17

SLC-8687549-2

## I.     INTRODUCTION

The patent-in-suit is directed to apparatuses called "Skid Hustlers"—machines designed to collect, stack and bundle lumber used in laying pipelines. While the asserted patent is straightforward and its claims would normally require little to no construction, Plaintiff's unreasonably broad interpretations of the three key claim terms makes construction of those terms by the Court necessary. Of these three terms, one in particular is crucial and likely dispositive of this case—"an extendable mast."

The parties here are certainly not strangers. James McLeod and Plaintiff Murray Pisony incorporated Defendant Commando Construction, Inc. ("Commando") and jointly own a predecessor patent, also directed to Skid Hustlers. But, when that business relationship ended, Plaintiff filed an application for his own patent seeking to claim the exact machines previously patented with Mr. McLeod. That application, which ultimately issued as the asserted patent, claims a very discrete "improvement" to Commando's prior art Skid Hustlers—"an extendable mast" used to raise and lower the conveyor frame, an improvement Plaintiff now advocates this Court simply disregard. Indeed, in order for Plaintiff to argue the horizontal, non-lengthening structure used to raise and lower the conveyor frame of the accused Skid Hustlers, Plaintiff must read both the "extendable" and "mast" requirements out of the asserted claims.

As set forth more fully below, Plaintiff urges this Court to ignore longstanding canons of patent law, and construe readily understood terms in a manner divorced from their plain and ordinary meaning. And, Plaintiff does not stop there—he also asks this Court to read language out of the claims that he was required to add in order for the claims to issue in the first place, and ignore the unambiguous teachings of the specification which are consistent with the plain import of the claim language. Defendants' proposed constructions, however, stay true to the claim language, the teachings of the patent specification, and the prosecution history. For these

1

reasons, the Court should adopt Defendants' proposed claim constructions.

## II.      BACKGROUND

### A.      Scope and Content of Prior Art

The asserted patent, U.S. Patent No. 7,591,629 (the "'629 patent"), titled "All Terrain Lumber Collection and Stacking Apparatus," is directed to Skid Hustlers—machines that pick up, stack, and bundle lumber. Declaration of Daisy Manning ("Manning Decl."), ¶ 2; Ex. A, Abstract. Skid Hustlers were not a new concept at the time the '629 patent application was filed. To the contrary, Plaintiff and Mr. James McLeod (President of Commando and sole shareholder of Defendant James McLeod Holdings, Inc. ("JMH")) had manufactured, leased, and patented the same type of machine when McLeod and Plaintiff were officers of Commando. Declaration of James McLeod ("McLeod Decl."), ¶¶ 1, 4, 6. Commando and JMH provide a brief summary of the first Skid Hustlers and the patents claiming the features of these prior art machines to provide the Court with context for the instant claim construction dispute.

In 1997, McLeod filed a patent application with the U.S. Patent and Trademark Office ("PTO") for a machine designed to collect elongate pieces of lumber ("skids") used to support pipe line sections while being welded and ultimately laid into the ground. *Id.*, ¶ 5. The application issued in 1999 as U.S. Patent No. 5,934,861 (the "861 patent"). Manning Decl., ¶ 3; Ex. B. The '861 patent specifically discloses a vehicle carrying a main conveyor on the rear of its chassis, and a conveyor table on the side of the vehicle that feeds skids to the main conveyor. Ex. B, Abstract. The conveyor table includes a conveyor belt carried on a frame and a picking assembly for lifting skids from the ground. *Id.* Of particular relevance here, the '861 patent teaches:

> The conveyor table 16 is mounted for pivotal movement about a horizontal pivot shaft 28 defining a pivot access [sic] adjacent the feed end 17a [of the main conveyor] for upward and downward vertical movement 29 of the forward end 27 of the conveyor table. Actuation of the vertical movement 29 is effected by a hydraulic drive cylinder 30 connected between the frame 20 and the underside of

2

the conveyor table 16.

*Id.* at 2:66-3:5. In other words, as shown below in Fig. 3, the '861 patent describes a side conveyor where the forward end (left) is raised and lowered by a hydraulic cylinder (30), causing the conveyor to pivot (28) and change its approach angle to the main conveyor. *See also Id.*, Fig. 1.



Subsequently, McLeod and Plaintiff incorporated Commando for the purposes of manufacturing, selling and leasing the Skid Hustler machines claimed in the '861 patent. McLeod Decl., ¶ 6. They built the first prototype in 1999 (the "1999 Skid Hustler"), which included a lifting assembly with a hydraulic cylinder attached between the vehicle and the side conveyor to raise and lower the forward end of the side conveyor. *Id.*, ¶ 7. It also included a rear conveyor mounted on a subframe pivotally connected to a main frame, and hydraulic cylinders used to raise and lower the subframe about its pivotal connection to the main frame. *Id.* This type of conveyor assembly has been known in the art since at least 1966. Manning Decl., ¶¶ 17-18; Ex. P, Fig. 3.

In 2000, Commando replaced the Skid Hustler's rear conveyor with a stacking and bundling assembly (the "2000 Skid Hustler"). *See* McLeod Decl., ¶ 8. That same year, McLeod and Plaintiff filed a patent application covering the modified Skid Hustler, which ultimately issued as U.S. Patent No. 7,320,202 (the "'202 patent"), which incorporates all of the '861 patent's teachings. *Id.*, ¶ 9; Manning Decl., ¶ 4; Ex. C at 1:50-59. The '202 patent describes a machine for picking, conveying, stacking and bundling skids including a vehicle, a side conveyor with a picking assembly at its forward end, an unscrambling and stacking assembly for receiving skids from the side conveyor, a bundling assembly for bundling and discharging the skids, and a

3

transfer conveyor to move the skids between the stacking and bundling assemblies. Ex. C,

Abstract. It specifically teaches that the picking assembly may be "in the form of a mechanically

operated grapple …" *Id.* at 5:24-28. And, similar to the '861 patent, the '202 patent describes the

vertical movement of the side conveyor:

> The coupling element 24 includes a link which allows the [side conveyor] frame
> to pivot inwardly and outwardly about a horizontal axis parallel to the direction
> 13 so that the picking section can pivot outwardly and *upwardly* or outwardly and
> *downwardly to accommodate changes in ground contour.*

*Id.* at 6:1-22 (emphasis added). In other words, the '202 patent discloses a pivotal coupling

element between the conveyor and the vehicle that raises and lowers the side conveyor to

accommodate for uneven terrain.

## B.    The Asserted '629 Patent

Not long after the '202 patent application was filed, a dispute arose between Mr. McLeod

and Plaintiff. McLeod filed several claims against Plaintiff in the Court of Queen's Bench of

Alberta, which ultimately resolved in 2004 pursuant to an agreement requiring Plaintiff to

transfer all shares and assets of Commando to McLeod. McLeod Decl., ¶¶ 10-11. However,

unbeknownst to McLeod, while the litigations were pending Plaintiff was building his own Skid

Hustler and filed a patent application (*Id.*, ¶ 12), which eventually issued as the '629 patent. Not

surprisingly, the '629 patent claims the exact features found in the 2000 Skid Hustler, as well as

those claimed in both the '861 and '202 patents, but with the inclusion of "an extendible mast."

Claim 1 (the only asserted independent claim here) provides (with the claim terms in

dispute emphasized):

> 1. An apparatus for picking up, stacking and bundling lumber, comprising:
> (a) a chassis,
> (b) a grapple carried with the chassis,
> (c) a conveyor assembly supported on the chassis,
> (d) a stacking assembly operatively connected adjacent the conveyor assembly,
> the stacking assembly including an unscrambling hopper, a row conveyor, a

stacking bin and a bundling assembly, and,

(e) a discharge platform operatively connected adjacent the bundling assembly, wherein the conveyor assembly includes a frame, **a pivotal connection for the frame to permit angular adjustment of the frame relative to the chassis**, **an extendible mast** connected between the frame and the chassis to drive the frame about the pivotal connection and a receiving bin and a conveyor carried on the frame, the conveyor positioned between the receiving bin and the stacking assembly and being operable to move the lumber from the receiving bin to the stacking assembly and the mast being operable to drive adjustment of the angle of the frame relative to the chassis to select the approach angle for the conveyor relative to the stacking assembly.

Ex. A, 12:2-24. Dependent claim 6, also at issue, claims "[t]he apparatus of claim 1 wherein **the mast includes a hydraulic cylinder drivable to telescope to various lengths**." *Id.*, 12:38-39.

While the '629 patent's specification does not once reference an "extendible mast", it does describe "a mast assembly":

The apparatus may also comprise a mast assembly 164, to raise and lower the conveyor assembly 18, to accommodate for the slope of the land on which the apparatus is being used. Therefore, conveyor assembly 18 may be moved up or down along mast assembly 164, which may comprise an inner mast and an outer mast 168, each of which may comprise a hydraulic cylinder disposed therein to provide means of moving the mast vertically. FIGS. 11A and 11B show the position of outer mast 168 and inner mast 166 at three different positions or heights, A, B, C, of conveyor assembly 18, corresponding to FIG. 10C, FIG. 10B and FIG. 10A, respectively.

*Id.* at 10:43-54. The specification provides further detail regarding the mast assembly, explaining that the "[i]nner mast 166 may be mounted relatively perpendicular to the chassis of the trailer 16"; "[c]onveyor assembly18 may be attached to outer mast 168 at pivot point 172, and moves up and down with outer mast 168"; "[i]nner mast 166 telescopes upwardly …"; and



"[a]s the mast assembly 164 is raised and lowered, the other end of the conveyor assembly 18 may also pivot about pivot point 165." *Id.* at 10:55-67. Figs. 10A-10C and 11A-11B, reproduced with annotation, show the vertically-oriented described "mast assembly."



During prosecution of the '629 patent, the originally filed independent claims did not include any limitations relating to movement of the conveyor assembly. However, they did include dependent claims directed to (1) "a means of raising and lowering the conveyor assembly" (claims 7 and 8); and (2) "a mast assembly for raising and lowering the conveyor assembly" (claims 15 and 16). Manning Decl., ¶ 8; Ex. G at 27-29. The PTO's examiner rejected all claims as anticipated (35 U.S.C. § 102) by Canadian Patent CA 2315046[1], including a means of raising and lowering a conveyor assembly. Manning Decl., ¶ 9; Ex. H at 2-3. In response, Plaintiff amended the claims to more specifically claim a grapple assembly on the machine, and reasserted the dependent claims directed to a "means of" and "a mast assembly for" raising and lowering the conveyor assembly. Manning Decl., ¶ 10; Ex. I at 2-5. Plaintiff's sole argument for patentability of his amended claims was the '202 counterpart "neither teaches nor suggests such

---

[1] Canadian Patent No. CA 2315046, issued to McLeod and Plaintiff, is the Canadian counterpart patent to and shares an identical specification with the '202 patent (which will be referenced hereafter as the "202 counterpart").

a grappling assembly." *Id.* at 6.

The examiner again rejected all claims as obvious (35 U.S.C. § 103) over the '202 counterpart and U.S. Patent No. 4,947,904 to Dika ("Dika"), finding that it would have been obvious to combine the teachings of the '202 counterpart with the grapple assembly of Dika. Manning Decl., ¶ 11; Ex. J at 2-5. The examiner reiterated the '202 counterpart discloses a means of raising and lowering conveyor assembly. Ex. J at 2-5. In response, Plaintiff again amended the claims and added new claim 26 (which issued as claim 1 of the '629 patent), arguing the '202 counterpart did not disclose the "extendible mast" limitation. Manning Decl., ¶ 12; Ex. K at 4-5, 8-9. The examiner again rejected the amended claims, including the dependent claims directed to "means of raising and lowering the conveyor assembly," but allowed claim 26 for the reasons argued by Plaintiff regarding the now included "extendible mast" limitation. Manning Decl., ¶ 13; Ex. L at 2-7.

### C.    The Accused Machines[2]

In 2008, Commando manufactured a second Skid Hustler, which includes the same components and configuration as the 2000 Skid Hustler, except the picking assembly was replaced with a grapple to collect lumber from the ground (as disclosed in the '202 patent), and the rear conveyor from the



1999 Skid Hustler was mounted on the side of the machine to serve as the side conveyor.

---

[2] The Federal Circuit has recognized that awareness of the accused product may provide "meaningful context" for claim construction. *Every Penny Counts, Inc. v. Am. Express Co.,* 563 F.3d 1378, 1383 (Fed. Cir. 2009).

McLeod Decl., ¶ 13. As noted above, this conveyor assembly, which comprises a conveyor mounted on a subframe pivotally connected to a main frame, and hydraulic cylinders to raise and lower the subframe about its pivotal connection to the main frame, has been well known in the art for over 50 years. Ex. O. Since 2008, Commando has manufactured three more Skid Hustlers having the same configuration as the modified 2008 Skid Hustler machine. McLeod Decl., ¶ 14. These four machines are accused of infringing the '629 patent.

### D.   Procedural Background

Since he filed this litigation, Plaintiff's infringement contentions have been a constantly moving target, which, relevant to the current claim construction dispute, shows Plaintiff is attempting to stretch the bounds of the claims beyond reason to assert a contrived infringement theory against Commando and JMH. It also shows his proposed claim constructions are litigation-induced and do not remotely reflect what the '629 patent actually discloses and claims.

In his Complaint filed March 2, 2017 and Amended Complaint filed May 18, 2017, Plaintiff alleged "[t]he hydraulic cylinders on Defendant's machine(s) are extendible masts, which are operable to drive adjustment of the angle of the frame relative to the chassis to select the approach angle for the conveyor relative to the stacking assembly." Dkt. 1, ¶ 18; Dkt. 3, ¶ 19. He also asserted that the "pivotal connection on the frame to permit angular adjustment of the frame relative to the chassis" was met by "a bolted hinge connection on both ends of a hydraulic cylinder." *Id.* However, on March 8, 2018, over a year after commencing this litigation, Plaintiff served infringement contentions asserting an entirely new theory of infringement—the subframe of the conveyor assembly allegedly constituted the "extendible mast," and the pivot between the subframe and the main frame met the "pivotal connection" limitation. Manning Decl., ¶ 6; Ex. E. Finally, *after* Commando served its invalidity contentions, and just days before parties served their proposed claim terms for construction, Plaintiff served amended infringement contentions

8

(in violation of the Scheduling Order), asserting a *third* theory of infringement—namely, the

subframe *and* the main frame of the conveyor assembly, both of which are horizontally-oriented,

rigid steel structures, constitute the "extendible mast." Manning Decl., ¶ 7; Ex. F.

## III.   ARGUMENT AND AUTHORITIES

### A.   Legal Principles of Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention

to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303,

1312 (Fed. Cir. 2005) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381

F.3d 1111, 1115 (Fed. Cir. 2004)). For this reason, "a claim construction analysis must begin and

remain centered on the claim language itself, for that is the language the patentee has chosen to

'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as

his invention.'" *Innova*, 381 F.3d at 1116.

The words of a claim "are generally given their ordinary and customary meaning…."

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), which is "the

meaning that term would have to a person of ordinary skill in the art in question at the time of the

invention." *Phillips*, 415 F.3d at 1313. However, it is well settled that patent claims cannot be

read in isolation and "must be read in view of the specification of which they are a part."

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The patent

specification "'is always highly relevant to the claim construction analysis. Usually, it is

dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at

1316 (*quoting Vitronics,* 90 F.3d at 1582). The specification provides the "written description" of

the invention required by 35 U.S.C. § 112, which "ensure[s] that the scope of the right to

exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to

the field of art as described in the patent specification." *Katz Interactive Call Processing Patent*

*Litig. v. Am. Airlines, Inc.*, 639 F.3d 1303, 1319 (Fed. Cir. 2011). Stated another way, a patentee cannot claim what he or she did not invent and disclose in the specification.

The file history is also "often of critical significance in determining the meaning of the claims." *Vitronics*, 90 F.3d at 1582. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. According to the Federal Circuit, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Where appropriate, the Federal Circuit has also authorized reliance on so-called "extrinsic evidence" (in contrast to "intrinsic evidence"—the patent claims, specification and prosecution history) in construing claim terms, so long as that evidence does not contradict the meaning of claim terms ascribed in the intrinsic record. *See Phillips*, 415 F.3d at 1317-18. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (citing *Markman,* 52 F.3d at 980).

### B.      Level of Ordinary Skill in the Art

"A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention." *Phillips*, 415 F.3d at 1313 (*quoting Innova*, 381 F.3d at 1116). A person of ordinary skill is a "hypothetical person who is presumed to be aware of all the pertinent prior art," and "is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). A person of ordinary skill in the field of the '629 patent would have a four-year degree in technical field such

10

as mechanical engineering or like discipline, and approximately 2 years of experience in the design and development of mechanical devices. In the absence of a degree in a technical field such as mechanical engineering, a person having ordinary skill in the art here would have at least 5 years of experience in the design and development of mechanical devices. Declaration of Dr. Richard Crawford ("Crawford Decl."), ¶ 24.

### C.    Disputed Claim Terms

The parties dispute the proper scope and construction of three claim terms in the '629 patent. *See* Manning Decl., ¶ 5; Ex. D. Plaintiff argues that two of these three terms should be accorded their plain and ordinary meaning, but nonetheless offers alternative constructions. *See* Ex. D. These constructions illustrate the dispute between the parties regarding the scope of the asserted claim terms, and demonstrate precisely why the Court must construe these terms so it is not improperly left to the jury to decide a question of law. "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

### 1.    "an extendible mast"

While the meaning of the term "extendible mast" seems evident on its face and could, in usual circumstances, be given its plain and ordinary meaning, this term needs construction due to Plaintiff's unreasonably broad proposed construction—"[a] structural support member capable of raising and lowering." Ex. D. This construction is not only untethered to the claim language, specification and prosecution history, it reads directly on the prior art as already found by the PTO. Commando/JMH, on the other hand, propose the term "extendible mast" means "a vertical pole or similar structure that may increase in length," which is consistent with *all* intrinsic and extrinsic evidence. *See id.*

The customary meanings, to both lay persons and persons of ordinary skill in the art, of both "mast" and "extendible" are consistent with Commando/JMH's proposed construction, whereas Plaintiff's proposed construction does not account for the customary meaning of *either* of these words. Crawford Decl., ¶ 41. In fact, Plaintiff's proposed construction reads the words "mast" and "extendible" completely out of the claim. "Mast" is a commonly used term with a well-established meaning to those of ordinary skill in mechanical engineering. *Id.*, ¶¶ 27-28. While "mast" is most frequently used to refer to vertically oriented members that carry ship sails, it is generally understood to mean a vertical pole or similar structure, which may also serve as a support structure. *Id.*, ¶¶ 30-31. The term "extendible" is an adjective modifying the term "mast," thereby referring to a structural feature of the mast itself. Namely, a person of ordinary skill in the art would understand "extendible" in this context to mean the distance between the distal ends of the mast may be increased. *Id.*, ¶ 32. In other words, the "mast," being vertically oriented, varies or increases in length height-wise. *Id.*

The '629 patent's specification is consistent with the plain and ordinary meaning of "extendible mast" and confirms that no special meaning was ascribed to this term by the patentee, and especially a meaning far broader than the plain import of the claim language. As discussed above, the specification never refers to an "extendible mast," but instead describes a "mast assembly." Ex. A at 10:43-67. Thus, the description of the "mast assembly" must inform the meaning of "extendible mast."

The specification exclusively describes the "mast assembly" as a vertical structure that may increase in length along its longitudinal axis, and every figure of the '629 patent depicting the "mast assembly 164"—Figures 2, 8, 10A-10C, 11A-11B and 12—unmistakably show a vertical pole that itself increases in length. The specification describes generally "the conveyor assembly may be *moved up or down along mast assembly* 164." *Id.* at 10:46-47. The

specification then focuses on a specific "mast assembly 164, which may comprise an inner mast 166 and an outer mast 168, each of which may comprise a *hydraulic cylinder dispose therein* **to provide means of moving the mast vertically**." *Id.* at 10:47-50. "FIGS. 11A and B show the position of outer mast 168 and inner mast 166 *at three different positions or heights,* A, B, and C." *Id.* at 10:50-52. The specification also teaches "[i]nner mast 166 may be mounted *relatively perpendicular to the chassis*," the "[c]onveyor assembly … *moves up and down with outer mast* 168," and "inner mast *telescopes upwardly* to achieve position A in FIG. 10C." *Id.* at 10:55-61.

The entire description of the "mast assembly"[3] is only logical in the context of a vertical pole-like structure that increases in length. Crawford Decl., ¶ 33. Specifically, the repeated references to the conveyor assembly moving up and down *along* a mast assembly *perpendicular* to the chassis to achieve different *heights,* and the mast assembly having a hydraulic cylinder disposed therein to move the mast *vertically* and allow the inner mast to *telescope upwardly* plainly shows "extendible mast" means precisely what the claim language indicates—a vertical pole or similar structure that may increase in length. *Id.*, ¶¶ 34-36. Indeed, this is precisely what *every* figure of the patent illustrates. Ex. A, Figs. 2, 8, 10A-10B, 11A-11B; Crawford Decl., ¶ 37. *See Katz Interactive*, 639 F.3d at 1319 (claim construction inquiry is guided by what was described in the specification and cannot overreach the scope of the inventor's contribution to the field).

The '629 patent's prosecution history confirms this construction. Crawford Decl., ¶ 38.

---

[3] A strong argument could be made that "extendable mast" should be limited to the inner/outer mast embodiment, as there is no suggestion or indication in the specification that the claimed machines can be configured with any other type of "extendible mast," and a patentee may not claim that which he did not invent and disclose in the specification. *See Katz Interactive*, 639 F.3d at 1319. However, that issue is not relevant to the parties' dispute and need not be addressed here.

13

As discussed above in Section II(B), the examiner repeatedly rejected claims directed to a "means of raising and lowering the conveyor assembly" because they were disclosed by the '202 counterpart. Plaintiff, however, asserts "extendible mast" simply means "a structural support member for raising and lowering," which is as equally broad as the "means of raising and lowering" described in the '202 counterpart. This construction cannot be correct for that reason alone. And, under Plaintiff's proposed construction, the asserted claims are necessarily invalid as anticipated by the '202 counterpart.

The examiner also rejected claims directed to "a mast assembly for raising and lowering the conveyor assembly," which is actually *narrower* than Plaintiff's now proposed construction, as it requires a "mast assembly" rather than "a structural support member," which encompasses an infinite number and types of structures other than "masts". *See* Ex. H at 2-3; Ex. J at 2-5; Ex. L at 2-7; Crawford Decl., ¶¶ 39-40, 42. The asserted claims were allowed only after Plaintiff amended them to include the "extendible mast" limitation and argued the '202 counterpart does not disclose this particular limitation. Now, however, Plaintiff attempts to broadly recapture what was repeatedly rejected by the examiner. This, too, is improper. *See Phillips,* 415 F.3d at 1317. In contrast, Commando/JMH's proposed construction captures the claimed invention in a manner faithful to the prosecution history and consistent with the examiner's reasons for allowance.

Also significant to construction of "extendable mast" is the prosecution history of a continuation patent application filed by Plaintiff claiming priority to the '629 patent, U.S. Patent Application No. 12/539,740 (the "'740 application"). "[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." *Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1349 (Fed. Cir. 2004). In the '740 application, Plaintiff presented the same rejected claims of the '629 patent application, including dependent claim 15 directed to a "mast assembly for raising and lowering

14

the conveyor assembly." Manning Decl., ¶¶ 14-15; Ex. M at 21; Ex. N at 4-5. The examiner (the

same as examiner as the '629 patent) rejected claim 15 under 35 U.S.C. § 103(a) as obvious over

the '202 counterpart in view of U.S. Patent No. 3,651,963 to McWilliams ("McWilliams"),

which itself discloses a "mast assembly 64 for raising and lowering a conveyor assembly 40."

Manning Decl., ¶ 16; Ex. O at 5.

Figure 1 of McWilliams
(reproduced with annotation),
shows a vertical pole-like structure
that raises and lowers a conveyor
assembly to adjust the approach
angle of the conveyer's discharge



end. Manning Decl., ¶ 19; Ex Q. Although the mast assembly of McWilliams constitutes "a

structural support member capable of raising and lowering" a conveyor, it does *not* increase in

length. This indicates that the examiner found the "*extendible* mast" of the asserted claims

crucial to novelty. Moreover, this also illustrates that under Plaintiff's proposed construction,

independent claim 1 is at least invalid as obvious under the '202 counterpart in view of

McWilliams.

The extrinsic evidence also supports Commando/JMH's proposed construction, and

shows the plain and ordinary meaning of "extendible mast," to both lay persons and those of skill

in the art, is "a vertical pole or similar structure that may increase in length." In addition to the

declaration of Dr. Crawford, general and technical dictionaries consistently define "mast" as a

"vertical pole" or an "upright post". *See, e.g.,* Manning Decl., ¶¶ 23-33; Exs. U-Z and AA-EE.

The dictionary definitions of "extendible" also comport with Commando/JMH's proposed

construction—"extendible" means "lengthen," "increase in length," "to stretch out; draw out to

15

full length," etc. *See* Manning Decl., ¶¶ 20-22; Exs. R-T.

In sum, the claims, specification, prosecution history and extrinsic evidence all show "extendable mast" means precisely what the plain language indicates—"a vertical pole or similar structure that may increase in length."

> ### 2.     "the conveyor assembly includes … a pivotal connection for the frame to permit angular adjustment of the frame relative to the chassis"

The primary dispute with respect to the above limitation is what it means for there to be a "pivotal connection for the [conveyor assembly] frame" that permits angular adjustment of the conveyor frame and the chassis. When read in view of the specification, and absent contrary evidence in the prosecution history, this term requires that the conveyor assembly frame include a pivot to allow for such angular movement.

The '629 patent's specification does not specifically reference the relative angular motion or adjustment "of the [conveyor assembly] frame relative to the chassis." However, it does address and specifically teach movement of the conveyor assembly, including its "frame," relative to the stacking assembly. *See* Ex. A at 10:30-42. There, the specification directs the reader to Figs. 10A-C, which in turn show the conveyor assembly frame and its relative angular movement with respect to the chassis—the "angular adjustment" is accomplished by "pivot point 165." *Id.* at 10:40-42.



FIGURE 10B

As shown in Figs.10A-C, and consistent with the claim language, pivot point 165 is part of the "conveyor assembly frame." This is the *only* embodiment described in the '629 patent and, more importantly, the only place in specification that mentions a pivotal connection for the conveyor assembly. The only other portion of the specification that addresses the movement of the conveyor assembly provides: "[a]s the mast assembly 164 is raised and lowered, the other end of conveyor assembly 18 may pivot about pivot point 165." *Id.* at 10:66-67.

As guided by the specification, the proper construction of this term is: "the conveyor assembly frame includes a pivot that allows the angle between the conveyor assembly frame and the chassis to change." Plaintiff's proposed construction—"a connection that permits angular movement of the frame relative to the chassis"—does not make grammatical sense and purposefully omits terms to confuse the issues at hand. First, Plaintiff suggests this Court read out "pivotal" from the term and interpret it as encompassing *any* kind of connection that permits angular adjustment. Second, Plaintiff also asks this Court to read out the phrase "for the frame." By interpreting the claim to allow the "pivotal connection" to be anywhere on the machine, the claim would have the same meaning if "for the frame" was simply omitted—"a pivotal connection ~~for the frame~~ to permit angular adjustment of the frame …" Like "extendible mast," Plaintiff's proposed construction eviscerates the claim language contrary to well-established patent law. It cannot be the proper construction. "Claims must be 'interpreted with an eye toward giving effect to all terms in the claim.'" *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

### 3.  "the mast includes a hydraulic cylinder drivable to telescope to various lengths"

Dependent claim 6 recites "[t]he apparatus of claim 1 wherein the mast includes a

hydraulic cylinder drivable to telescope to various lengths." Ex. A at 12:38-39. As noted above, "the mast" as provided in claim 1 (from which claim 6 depends) is required to be "extendible," i.e., able to increase in length along its longitudinal axis. *Id.* at 12:13-15. Under 35 U.S.C. § 112(d), a dependent claim "shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered." That is, claim 6 must be construed to include all of the limitations of claim 1 and must also specify further limitations of the subject matter of claim 1. *Id.* Simply stated, claim 6 requires "the mast" to be construed as "the extendible mast." When considered with the remainder of claim 6, simple logic dictates the "extending" function of "the mast" element is performed (i.e., "driven") by a telescoping hydraulic cylinder.

Here, the term "drivable" modifies "hydraulic cylinder," and the "driving" causes the mast to telescope to various lengths. The sole reference in the specification to a "hydraulic cylinder" used in relation to the "mast" describes using the naturally telescoping nature of a hydraulic cylinder "to provide the means of moving the mast vertically," showing "the mast" in exemplary varying lengths at positions A, B, C. Ex. A at 10:43-54, Figs. 10A-C, 11A-B. There, the "hydraulic cylinder" is described as being a part of the "mast" and further being "disposed therein"—i.e., the hydraulic cylinder is contained inside of the "mast" itself. *Id.* at 10:46-50.

The term "telescoping" only appears once in the specification, and is directed to how the "mast" can vary in length, and specifically to extend "upwardly to achieve" the height of "position A," best show and articulated in Fig. 11B (annotated). *Id.* at 10:60-61, Figs. 10A-C, 11A-B.



Hydraulic cylinders are well known mechanical devices that generally consist of at least two inter-fitting, tube-in-tube or nested members. Crawford Decl., ¶ 48. As fluid is forced into the hydraulic cylinder, the distal ends of these nested members extend away from one another and the combined device grows in length. That is, the nested members of the hydraulic cylinder telescope apart. *Id.* As such, hydraulic cylinders inherently "telescope" in length.

As provided in claim 6, and in view of the specification, a proper interpretation of this claim would encompass a hydraulic cylinder disposed within the distal end of a fixed length mast, and, as the hydraulic cylinder telescopes, the "mast" extends or grows in its overall vertical length, as the hydraulic cylinder would be considered a part of the "expandable mast." *Id.*, ¶ 49. Similarly, while not specifically described in the specification, this reading could encompass a hydraulic cylinder disposed inside nested and telescoping pole-like segments making up the "extendible mast." As the hydraulic cylinder is put into action, it pushes one of the nested mast segments along their vertical axis, driving the nested segments apart length-wise, thereby telescoping the mast in a vertical (upward) direction, extending in length. *Id.*, ¶ 50. Under either reading, as the hydraulic cylinder increases its length along its longitudinal axis, the mast extends

19

along its longitudinal axis. In other words, the mast itself telescopes in length, and the hydraulic cylinder acts as the means of varying the length of the extendable mast. *Id.*, ¶ 51. Thus, the proper construction for this dependent claim is: "a hydraulic cylinder within the extendible mast causes the extendable mast to vary in length in a telescoping manner (i.e., overlapping sections slide in and out from one another)." *Id.*, ¶ 46.

Plaintiff's proposed construction seeks, in the alternative, to merely replace the term "includes" with "incorporates" and does not in any way work to clarify the disputed part of this claim.[4] Moreover, Plaintiff's proposed construction flatly ignores that "the mast" has to be extendible—i.e., able to increase in length. Plaintiff suggests that the phrase "drivable to telescope to various length" simply and solely refers to the hydraulic cylinder itself, and has no impact on the length of "the mast" itself. This construction, however, improperly renders those terms redundant and superfluous, as a hydraulic cylinder necessarily telescopes to various lengths. *See Becton*, 616 F.3d at 1257.

## IV.    CONCLUSION

For the foregoing reasons, the claim terms at issue should be construed consistent with Commando and JMH's proposed constructions herein.

---

[4] Plaintiff suggests claim 6 needs no construction and it should be given its plain and ordinary meaning. Plaintiff's alternative proposed construction suggests the hydraulic cylinder is the element "telescoping to various lengths" *without* extending the mast to various lengths. Thus, the parties dispute the meaning of this term and it must be construed. *O2 Micro*, 521 F.3d at 1360.

Dated:  July 20, 2018

Respectfully submitted,

By: */s/Rudolph A. Telscher*
Rudolph A. Telscher, Jr.,
Missouri Bar No. 41072*
rudy.telscher@huschblackwell.com
Daisy Manning
Missouri Bar No. 62134*
daisy.manning@huschblackwell.com
Michael R. Annis
Missouri Bar No. 47374*
mike.annis@huschblackwell.com
Shannon D. Peters
Missouri Bar No. 66953*
shannon.peters@huschblackwell.com
Erin D. Knese
Missouri Bar No. 70171*
erin.knese@huschblackwell.com
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
314-480-1500 Telephone
314-480-1505 Facsimile
*admitted pro hac vice

and

Albert A. Carrion
Texas State Bar No. 03883100
HUSCH BLACKWELL, LLP
111 Congress Avenue Suite 1400
Austin, Texas 78701-4093
512.703.5798 Telephone
512.479.1101 Facsimile
Albert.Carrion@huschblackwell.com

***Attorneys for Defendants/Counterclaim
Plaintiffs Commando Construction, Inc. and
James McLeod Holdings, Inc.***

21

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2018 I caused the foregoing to be filed electronically with the Clerk of Court and to be served via the Notice of Electronic Filing from the Court's Electronic Filing System upon all counsel of record.

/s/Rudolph A. Telscher

22